FILED

MAY 0 9 2012

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

IN THE MATTER OF THE SEARCH OF    )
                                  )
**The residence located at 2900 Sand**    )
**Road, Lot 177, Edwardsville, Illinois**    )
**62025, further described as a one-storey**    )  CASE NUMBER 12-mj-3084-DGW
**trailer home bearing the number 177 in**    )
**black lettering, and computer**    )
**equipment, including computer**    )  **FILED UNDER SEAL**
**hardware, appurtenant devices, and**    )
**computer-related documentation,**    )
**located therein.**    )

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

I, Ashley Frazer, being duly sworn depose and say:

I am a Special Agent of the Federal Bureau of Investigation, and have reason to believe that

on the person or on the premises known as:

**The residence located at 2900 Sand Road, Lot 177, Edwardsville, Illinois 62025,**
**further described as a one-storey trailer home bearing the number 177 in black**
**lettering, and computer equipment, including computer hardware, appurtenant**
**devices, and computer-related documentation, located therein.**

in the Southern District of Illinois there is now concealed a certain person or property, namely:

**See the attached list entitled "Attachment A – Items to be Seized"**

in violation of Title 18, United States Code, Sections 875(c) and 2261A(2) the facts to support the

issuance of a Search Warrant are as follows:

## AFFIDAVIT

I, Ashley Frazer, being duly sworn, do hereby depose and state:

### A.    Introduction.

1.    I am a Special Agent with the Federal Bureau of Investigation. I have been employed as an FBI SA since August 2010, and am currently assigned to a Cyber Crimes Task Force. Since January 2011, I have participated in investigations involving computer and high technology related crimes including computer intrusions. I have gained expertise in conducting such investigations through training from colleagues on the task force, during the execution of search warrants, to include those involving searches and seizures of computers, computer equipment, and electronically stored information. I have received both formal and informal training in the detection and investigation of computer-related offenses. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2.    This affidavit is made in support of an application for a search and seizure warrant to search for and seize instrumentalities, fruits, and evidence of the violation of Title 18, United States Code, Section 875(c), which criminalizes the transmission of threatening communications in interstate commerce, and Title 18, United States Code, Section 2261A(2), which criminalizes interstate stalking and cyberstalking. The items that are the subject of the search and seizure applied for in this affidavit are more specifically described in Attachment A, which is incorporated by reference.

3.    The statements in this affidavit are based on information and records provided by witnesses, consultations with other knowledgeable investigators, and on my experience, training, and

2

background as a Special Agent with the Federal Bureau of Investigation. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violation of Title 18, United States Code, Sections 875(c) and 2261A(2), including, but not limited to, the items described on Attachment A, which is attached hereto and incorporated herein by reference, will be found at the residence located at 2900 Sand Road, Lot 177, Edwardsville, Illinois 62025, further described as a one-storey trailer home bearing the number 177 in black lettering, and any computer equipment, including computer hardware, appurtenant devices, and computer-related documentation, located therein ("the property to be searched"). Two photographs of the property to be searched are attached to this Affidavit.

**B.    Statutory Authority.**

4.    This investigation concerns the alleged violation of Title 18, United States Code, Section 875(c), which criminalizes the transmission in interstate or foreign commerce of any communication containing any threat to injure the person of another, and Section 2261A(2), which criminalizes interstate stalking and cyberstalking.

**C.    Definitions.**

5.    The following definitions apply to this Affidavit and Attachments A and B to this Affidavit:

      a.    The term "computer," as used herein, is defined pursuant to Title 18, United States Code, Section 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and

3

includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

b.     "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks). "Appurtenant devices" refer to devices of computer hardware that are used in connection with other computer hardware, such as peripheral storage devices, external hard drives, detachable memory devices, and the like. Computer hardware includes personal electronic media such as smart phones, cellular phones, tablets, and the like.

c.     "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

4

d.     "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which includes computer software, or other related items.

e.     The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

f.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data

5

security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g.   The "Internet" is a collection of computers and computer networks which are connected to one another via high-speed data links and telephone lines for the purpose of sharing information. Connections between Internet computers exist across state and international borders and information sent between computers connected to the Internet frequently crosses state and international borders, even if those computers are in the same state. A network is a series of devices, including computers and telecommunication devices, connected by communication channels.

h.   "IP address." Every device on the Internet has an address that allows other devices to locate and communicate with it. An Internet Protocol ("IP") address is a unique number that identifies a device on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Most Internet service providers ("ISPs") control a range of IP addresses. When an ISP or other provider uses dynamic IP addresses, the ISP assigns one of the available IP addresses in the range of IP addresses controlled by the ISP each time a user dials into the ISP to connect to the Internet. The customer's computer retains that IP address for the duration of that session (i.e., until the user disconnects), and the IP address cannot be assigned to another user during that period. Once the user

6

disconnects, however, that IP address becomes available to other customers who dial in at a later time. Thus, an individual customer's IP address normally differs each time he dials into the ISP. A static IP address is an IP address that is assigned permanently to a given user or computer on a network. A customer of an ISP that assigns static IP addresses will have the same IP address every time. Other addresses include Uniform Resource Locator (URL) addresses, such as "http://www.usdoj.gov," which are typically used to access web sites or other services on remote devices. Domain names, host names, and machine addresses are other types of addresses associated with Internet use.

i.      "Log files" are computer files that contain records about system events and status, the identity and activities of users, and anomalous or unauthorized computer usage. Names for various log files include, but are not limited to: user logs, access logs, audit logs, transactional logs, and Apache logs. Logs can also maintain records regarding the identification of users on a network, as well as Internet sites accessed by the computer.

j.      Electronic mail ("email") is a popular form of transmitting messages and/or files in an electronic environment between computer users. When an individual computer user sends email, it is typically initiated at the user's computer, transmitted to a mail server, and then transmitted to its final destination. A server is a computer that is attached to a dedicated network and serves many users. An email server may allow users to post and read messages and to communicate via electronic means.

7

**D.      Investigation and Probable Cause.**

6.      Victim R.J. was involved in a brief romantic relationship with Timothy O'Laughlin during the early summer of 2011. In or around the beginning of July 2011, R.J. terminated the relationship. After the termination of the relationship, Timothy O'Laughlin engaged in a lengthy course of conduct designed to stalk and harass R.J., and to place her in fear of death or serious bodily injury, which commenced in or around July 2011 and continued through April 2012. During this time period, O'Laughlin resided in the home of a friend located in Illinois, i.e. at the property to be searched, while R.J. has resided in Florissant, Missouri. R.J. has received numerous unsolicited phone calls, voice mails, emails, and text messages from O'Laughlin, of a stalking and harassing nature. R.J. reports that O'Laughlin has made statements threatening physical harm, including threats to break her neck and the necks of anyone with her. R.J. states that O'Laughlin has also appeared at R.J.'s residence and engaged in physically threatening behaviors such as lunging at R.J., though without physically contacting her. It is believed that O'Laughlin also created an online profile of R.J. on a popular dating website, PlentyOfFish.com, using R.J.'s real name and pictures of her. Posing as R.J. through this online profile, O'Laughlin invited several men who were strangers to R.J. to have sex with R.J., providing them with R.J.'s correct personal contact information to allow them to follow up. R.J. has received and preserved email communications from multiple strangers who believed that she was willing to have sex with them as a result of an account at PlentyOfFish.com that R.J. did not set up, and communications through that account that R.J. did not send. R.J. is unaware of any other individual besides O'Laughlin with a similar motivation to do this.

8

7.    R.J. has preserved numerous voice mail, email, and text message communications from O'Laughlin. These messages corroborate R.J.'s account of O'Laughlin's behavior toward her. They contain numerous obscene and abusive statements directed at R.J., as well as many bizarre and sexually explicit communications, and race- and gender-based slurs. The messages frequently accuse R.J. of promiscuous and meretricious behaviors. Certain of these messages contain ominous threats of physical harm against R.J. and those associated with her. For example, in an email dated February 10, 2012 sent to R.J. from O'Laughlin's email address **timmy-nation@hotmail.com**, O'Laughlin referred to the Mel Gibson movie "Payback," in which the main character kills a large number of people in retribution after being betrayed by a partner and an unfaithful wife. O'Laughlin inserted R.J.'s name in parentheses in the email after the description of the unfaithful wife, who dies of a drug overdose in the movie. The email concluded with the question posed to R.J., "You going to stop Hooking and will I stop Killing people?" Similarly, in a voice mail message dated March 1, 2012, O'Laughlin stated to R.J., "One day, someone's going to f—ing break your f—ing head off your shoulders. Rack your jaw right off." These statements are in addition to numerous reported oral threats of violence against R.J.

8.    O'Laughlin's course of conduct toward R.J. over the last several months has placed R.J. in reasonable fear of death or serious bodily injury, both for herself and for her children. In addition, it has caused her substantial emotional distress.

9.    R.J. has knowledge that, during all times relevant to this application, O'Laughlin has used the web-based email account **timmy-nation@hotmail.com** for personal communications. He has also less frequently used the email account dapples@charter.net. R.J. has preserved

9

numerous harassing emails that she has received from this email account. These messages include the February 10, 2012 email referring to the movie "Payback" described above. Another message forwarded by O'Laughlin to R.J. reveals that O'Laughlin has used **timmy-nation@hotmail.com** as his contact email address for Facebook notifications. The stream of harassing communications from this email address to R.J.'s personal account goes back at least until early July, 2011. For example, in an email dated July 7, 2011, O'Laughlin told R.J. "i am sure as hell not finished with you...." These emails include messages that abuse R.J. in obscene terms, that contain unwelcome sexually explicit content and propositioning, and that use racially abusive language to describe a romantic partner of R.J., among other things. O'Laughlin frequently attaches image files and files downloaded from the internet to email messages sent to R.J., including sexually explicit image files. R.J. has continued to receive such emails from this account through April 2012.

10.    Victim E.C. had a slight acquaintance with O'Laughlin in high school many years ago. E.C. denies ever having a romantic relationship, or even any significant acquaintance, with O'Laughlin. Nevertheless, over the past 12 years, O'Laughlin has engaged in a long course of conduct to stalk and harass E.C. and her family, and place her in fear. During this time period, O'Laughlin has resided in Missouri and Illinois, and has directed his behavior toward E.C. in other states such as Wisconsin and Texas. In July 2000, E.C. filed a St. Louis County police report against O'Laughlin, reporting that he was harassing her with lewd and threatening phone messages. During this time frame, E.C. was attending medical school in Wisconsin. In 2000, O'Laughlin traveled to Wisconsin uninvited and gained admittance to E.C.'s residence under false pretenses, terrifying E.C. O'Laughlin occasionally calls his

former boss at the Boeing Company and engages in rambling conversations.  During these conversations, he expresses an irrational and frightening level of anger toward E.C.  He accuses Boeing personnel of being in collusion with E.C.  The Boeing manager reports that O'Laughlin claims that he has an unusually large penis and threatens that he will have sex with E.C. with it so as to injure her.  He also states that O'Laughlin has admitted that he has thrown a brick through the window of the home of E.C.'s elderly father, located in St. Louis County; the father independently reports that his home was vandalized in this way.  E.C.'s father, who is over 80 years old, reports that O'Laughlin frequently comes by the father's house in St. Louis and intimidates him by parking outside with no shirt on, leaving objects on the front porch, and calling the house up to 10 times per day.  E.C. currently resides and practices medicine in Texas, and notes that she cannot de-list her contact information due to the nature of her work as an OB/GYN, since her patients must contact her.  E.C. reports that O'Laughlin has exploited this situation to harass and terrify her and her family relentlessly over a period of more than a decade.  Emails from O'Laughlin's email account timmy-nation@hotmail.com confirm that O'Laughlin has continued to send E.C. stalking and harassing communications through April 2012.  As with the messages to R.J., many of these emails include image file attachments.  Like R.J., E.C. has also received similar communications by text message from O'Laughlin.  For example, on March 29, 2012, O'Laughlin texted to E.C. a picture of an erect penis with a hand on it, with the message "cum get ur bday present."  On April 6, 2012, O'Laughlin sent a text message to E.C., saying "When we fuckn."  In an interview, E.C. expressed a high level of fear, frustration, and

11

emotional distress about her helplessness to stop the stalking and harassment by O'Laughlin of herself and her elderly father.

11.     On December 6, 2011, O'Laughlin placed an interstate phone call to a Boeing switchboard in St. Louis. He was transferred to a Boeing manager and left a recorded voice mail in which he accused Boeing of tracking his movements and plotting to attack him. He accused Boeing managers of being in collusion with "that cunt [E.C.]." He stated that he would "cut fucking heads off literally," that he would "bury" Boeing employees, that he would "fucking cut his head off and burn his house down," that he would be "breaking necks," and that he would "split fucking heads off in half." Toward the end, he claimed that he was a former Green Beret and stated, "If you want a war, bring it on." This message threatens harm to both E.C. and to Boeing employees. Phone records indicate that this phone call was placed from the land line at 2900 Sand Road, Lot 177, Edwardsville, Illinois, to Boeing telephones in the Eastern District of Missouri.

12.     On May 3, 2012, the federal grand jury in the Eastern District of Missouri returned an indictment against Timothy O'Laughlin, charging him with two counts of interstate stalking in violation of 18 U.S.C. § 2261A(2), and one count of interstate transmission of a threatening communication in violation of 18 U.S.C. § 875(c), based on the events described above.

13.     During the times described in this affidavit, Timothy O'Laughlin has been known to reside in the trailer home located at 2900 Sand Road, Lot 177, Edwardsville, Illinois. This trailer home is owned by the father of a friend of O'Laughlin. This friend, whose name is David Apples, also resides in the trailer home. While R.J. was dating O'Laughlin during the early

12

summer of 2011, they spent time together in this trailer home. During the intervening time period, numerous phone and email communications made by O'Laughlin have been identified from electronic records as originating from the property to be searched. When shown a photograph, a maintenance employee for the trailer park where 2900 Sand Road, Lot 177 is located positively identified O'Laughlin as a resident of Lot 177. The maintenance employee had seen O'Laughlin at the property to be searched on multiple recent occasions. The most recent time this witness has seen O'Laughlin at the property to be searched was May 4, 2012. In addition, on May 7, 2012, FBI agents conducting surveillance on Lot 177 observed O'Laughlin exit the trailer home and stand around the outside of it for an extended period of time. Moreover, on May 7, 2012, a green 1994 Pontiac Bonneville, Missouri License plate UA9 A7U, registered to Timothy O'Laughlin, was parked adjacent to 2900 Sand Road, Lot 177 during the day. O'Laughlin has no known steady employment or place of work. Based on my experience, persons commonly keep and maintain their computer equipment at the place where they reside.

14. Electronic records procured during this investigation indicate that O'Laughlin has used computer equipment located in the trailer home at 2900 Sand Road, Lot 177 to send numerous stalking and harassing communications to R.J., during the time frames described in this affidavit. Header information indicates that the originating IP address for several harassing and stalking emails that R.J. received from timmy-nation@hotmail.com were sent from the following three IP addresses: 24.107.216.102, 24.107.213.57, and 24.216.178.59. In response to subpoena, Charter Communications has confirmed that these three IP addresses are dynamic IP addresses that were assigned to 2900 Sand Road, Lot 177, at the

13

time the emails were sent to R.J. Specifically, the IP address 24.107.216.102 was assigned to the property to be searched from January 31, 2012 through March 1, 2012. The IP address 24.107.213.57 was assigned to the property to be searched from December 19, 2011 through January 3, 2012. The IP address 24.216.178.59 was assigned to the property to be searched from June 27, 2011 through October 20, 2011. Emails sent to R.J. from timmy-nation@hotmail.com originated from each of these three IP addresses during the times they were assigned to the property to be searched. For example, a survey of the header information of 35 email messages sent from O'Laughlin to R.J. during the time period from January 31, 2012 through March 1, 2012, indicates that 28 of the 35 emails originated from the dynamic IP address 24.107.216.102, which was assigned to 2900 Sand Road, Lot 177, Edwardsville, Illinois, during that entire time period.

15.    Based on the foregoing information, there is probable cause to believe that computer equipment used to send harassing and threatening emails to R.J. and E.C. is currently located in the trailer home located at 2900 Sand Road, Lot 177, Edwardsville, Illinois 62025. Based on discussions with person(s) with expertise in computer investigations, I understand that using computer equipment to attach images to an email message and to send an email from a web-based email account is likely to leave electronic traces of such activity on the hard drive of the computer and/or on appurtenant devices, such as external thumb drives or other memory storage devices.

## E.    Computer Examination Methodology To Be Employed.

16.    Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I am aware that computer data can be

14

stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I am also aware of the following considerations:

a.      Searching computer systems often involves a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is often not possible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

B.      Searching and analyzing computer systems often requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data may be vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is helpful to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

C.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the

15

extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Therefore, a substantial amount of time is sometimes necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

17. Based on my knowledge, training, and experience, including the experience of other agents, your affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains

16

a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

18.    Searching a computer system for the evidence described in Attachment A may require a range of computer forensic analysis techniques. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. In order to properly execute the search authorized by the warrant, specially trained agents or forensic analysts will be required to conduct a thorough forensic analysis of the seized media, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant requests permission to use whatever computer forensic analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

19.    The examination procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other examination procedures may be used):

a.    examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

17

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

c.      surveying various file directories and the individual files they contain;

d.      opening files in order to determine their contents;

e.      scanning storage areas;

f.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

g.      performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment A.

## F.   **Conclusion.**

20.    Based upon the above information, your affiant asserts that this affidavit establishes probable cause to believe that evidence and/or instrumentalities of the violation of 18 U.S.C. § 875(c) and 2261A(2) are currently located in the residence located at 2900 Sand Road, Lot 177, Edwardsville, Illinois 62025, further described as a one-storey trailer home bearing the number 177 in black lettering, and computer equipment, including computer hardware, appurtenant devices, and computer-related documentation, located therein.

21.    In consideration of the foregoing, I respectfully request that this court authorize a search and seizure warrant for the residence located at 2900 Sand Road, Lot 177, Edwardsville, Illinois 62025, further described as a one-storey trailer home bearing the number 177 in black

lettering, and computer equipment, including computer hardware, appurtenant devices, and computer-related documentation, located therein.


FURTHER AFFIANT SAYETH NAUGHT.


Ashley Frazer, Special Agent
Federal Bureau of Investigation


STEPHEN R. WIGGINTON
United States Attorney

KATHERINE L. LEWIS
Special Assistant United States Attorney


| State of Illinois | ) | |
|---|---|---|
| | ) | SS. |
| County of St. Clair | ) | |


Sworn to before me, and subscribed in my presence on the 9th day of May, 2010, at East St. Louis, Illinois.


DONALD G. WILKERSON
United States Magistrate Judge


19

**ATTACHMENT A - ITEMS TO BE SEIZED**

1.      Any and all text files, electronic images, visual depictions, or other records, in electronic or paper format, relating to email messages and image files and other attachments sent from timmy-nation@hotmail.com or dapples@charter.net or other email accounts to email accounts associated with the women identified as R.J. and E.C. in the attached affidavit.

2.      Any and all electronic records, log files, or other evidence of internet usage or access to the web-based email accounts timmy-nation@hotmail.com and dapples@charter.net or other email accounts used or controlled by Timothy O'Laughlin.

3.      Any and all electronic records, text files, or other files, in electronic or paper format, relating to text messages and attachments sent from Timothy O'Laughlin, whether by computer or cellular telephone, to the women identified as R.J. and E.C. in the attached affidavit.  Agents are authorized to seize and search personal electronic media capable of sending text messages.

4.      Any and all electronic records, text files, or other files, in electronic or paper format, relating to the establishment and use of an online account at the dating website "PlentyOfFish.com" in the name of the woman identified as R.J. in the attached affidavit, including any communications sent and received from other users of that website.

5.      Any and all computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.

6.      Any and all documents, correspondence, records, e-mails, and internet history (in documentary or electronic form) pertaining to the preparation, possession, or sending of the email messages, text messages, and online communications described in paragraphs 1-5.

7.      Any and all computer equipment, including computer hardware, appurtenant devices, and computer-related documentation, containing any of the items described in this Attachment.

8.      Copies of all the above in whatever form including digital format.

9.      Documents, records, or any other materials evidencing the residency of Timothy O'Laughlin at 2900 Sand Road, Lot 177, Edwardsville, Illinois 62025, during the period July 2011 through April 2012.

## ATTACHMENT B - PROPERTY TO BE SEARCHED

The residence located at 2900 Sand Road, Lot 177, Edwardsville, Illinois 62025, further described as a one-storey trailer home bearing the number 177 in black lettering, and computer equipment, including computer hardware, appurtenant devices, and computer-related documentation, located therein. Two photographs of the trailer home are attached.

21



